# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. ) |
| | ) **PLAINTIFF DEMANDS** ) **TRIAL BY JURY** ) |
| LOUIS N. RADDEN, D.O. and SPINE SPECIALISTS OF MICHIGAN, P.C. | ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm") for its

Complaint ("Complaint") alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action seeks to recover money that Defendants Louis N. Radden,

DO ("Dr. Radden") and Spine Specialists of Michigan, P.C. ("Spine Specialists")

fraudulently obtained through the submission of thousands of medical bills and

supporting documentation to State Farm for medically unnecessary examinations,

pain-management injections, and related procedures, which were purportedly

provided to individuals ("patients") involved in motor vehicle accidents and

eligible for insurance benefits under State Farm policies. (Dr. Radden and Spine Specialists are referred to collectively as "Defendants.")

2. As discussed below, Dr. Radden falsely purports to legitimately examine and diagnose patients, and then prescribes three types of pain-management injections – epidural steroid injections ("ESIs"), facet injections ("FIs"), and medial branch blocks ("MBBs"). The bills and supporting documentation that Dr. Radden submits for these services through his company, Spine Specialists, are fraudulent because: (a) Dr. Radden does not perform legitimate examinations of the patients; (b) the patterns in Dr. Radden's documented findings and diagnoses are based upon templates, are predetermined, and are not credible; (c) the injections purportedly performed by Dr. Radden are not performed because they are indicated or medically necessary, but are performed pursuant to a predetermined protocol that is designed to enrich Defendants; (d) the injections purportedly performed by Dr. Radden expose patients to undue and serious risks, including paralysis and death, by unnecessarily exposing them to the dangers of invasive procedures in and around spinal structures, and potentially dangerous levels of steroids and unnecessary anesthesia; (e) Dr. Radden's alleged use of epidurography in conjunction with all the ESIs that he performs is not done because it is indicated or medically necessary, but to enrich Defendants; (f) Dr. Radden does not use sufficient contrast to perform a

legitimate epidurogram, does not maintain a radiographic image from the alleged epidurogram, does not prepare a specific, detailed report of his findings for any epidurogram, and directs that bills be submitted to State Farm that improperly unbundle the billing codes to submit separate charges for epidurograms and fluoroscopy, improperly increasing the aggregate charges for these procedures; (g) Dr. Radden improperly directs his company, Spine Specialists, to submit bills to State Farm for a contrast material that Dr. Radden does not use to justify substantially inflated charges; and (h) Dr. Radden routinely makes disability findings with no documented basis or rationale for such findings.

3.     Defendants' purported services were not intended to legitimately evaluate and treat patients.  Instead, they were designed and carried out to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims to curry favor with referral sources, including a small group of personal injury attorneys ("PI Attorneys") with whom Defendants appear to have substantial relationships.

4.     Defendants' scheme began at least as early as 2007, has continued uninterrupted since that time, and accelerated substantially in June 2011 when Defendants moved into their own suite, in which Dr. Radden purportedly performs the medically unnecessary injections and related services.  As a direct and

proximate cause of Defendants' scheme, State Farm has paid Defendants more than $400,000.

5.      State Farm brings this action seeking a declaratory judgment that it is not liable for Defendants' unpaid pending bills for examinations, pain-management injections, and related procedures.  This action also asserts common law claims for fraud and unjust enrichment, as well as statutory claims under 18 U.S.C. § 1962(c) ("RICO") to recover actual damages of more than $400,000 paid to Defendants, plus treble damages and costs, including reasonable attorneys' fees.

6.      State Farm has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association, or any other source for any of the claims at issue in this case.

## II.      JURISDICTION AND VENUE

7.      Pursuant to 28 U.S.C. §1332(a)(1), this Court has jurisdiction over all causes of action because the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the cause of action brought under 18 U.S.C. § 1961 et seq. because it arises under the laws of the United States.

8.      Pursuant to 28 U.S.C. §1367(a), this Court also has supplemental jurisdiction over causes of actions that are so related to the cause of action over

which it has original jurisdiction that they form part of the same case or controversy.

9.     Pursuant to 28 U.S.C. §1391(a), venue is proper in this district because Defendants reside here, and a substantial part of the events or omissions that gave rise to the causes of action occurred here.

## III.   THE PARTIES

### A.   Plaintiff

10.     State Farm Mutual Automobile Insurance Company is a citizen of the State of Illinois.  It is incorporated under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois.  It is licensed and engaged in the business of insurance in Michigan.

### B.   Defendants

11.     Defendant Louis N. Radden, DO resides in and is a citizen of the State of Michigan.  Dr. Radden is a Michigan-licensed doctor of osteopathic medicine and has been the owner of Spine Specialists since its creation in February 2007. Since that time, Dr. Radden knowingly caused to be submitted thousands of bills and related documentation through his company, Spine Specialists, to State Farm in the claims described in part in the charts attached hereto as Exhibits 1A-1B and 2-3.

12.     Defendant Spine Specialists of Michigan, P.C. is a citizen of the State of Michigan.  It is a professional service corporation owned by Dr. Radden and

organized under the laws of the State of Michigan.  Its registered office address is listed as 28426 West Eight Mile Road, Farmington Hills, Michigan.  All of the bills and supporting documentation at issue in this case were submitted to State Farm by Spine Specialists at the direction of Dr. Radden.

## IV.  ALLEGATIONS COMMON TO ALL COUNTS

### A.  First-Party Claims for Payment Under The No-Fault Act

13.    Under the Michigan No-Fault Act, insurers are required to pay personal protection insurance benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those benefits are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle" (hereinafter, "No-Fault Benefits").  MCL §§ 500.3105, 3107(1)(a).  For the reasons described herein, the charges at issue were not for reasonably necessary medical services for an injured person's care, recovery, or rehabilitation, and Defendants knew it.

### B.  Third-Party Tort Claims for Non-Economic Loss Under The No-Fault Act

14.    Under the Michigan No-Fault Act, individuals who are not at fault for the accidents underlying their claims can also potentially recover: (a) non-economic losses, such as for pain and suffering, from the drivers who were at fault for the accident ("At-Fault Drivers") through a claim for bodily injury (a "BI

Claim"), only in limited situations, including if the individual has suffered serious impairment of body function, *see* MCL §500.3135; or (b) if recovery under the BI Claim is insufficient, from the individual's own insurance company through an uninsured or underinsured motorist claim (a "UM Claim").

15.     An individual has suffered serious impairment of body function when the general ability to conduct the course of his or her normal life has been affected because of the injury.   A determination of whether an individual has suffered serious impairment of body function requires an analysis of the totality of the circumstances, including: (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, (e) the prognosis for eventual recovery, and (f) whether there is "objective manifestation" of the injury.

16.     Most patients whose claims are at issue are or were represented by a small group of PI Attorneys who have used Defendants' bills and supporting documentation to support inflated BI and UM claims.   The PI Attorneys stand to profit from the inflated value of these claims because they typically take a percentage of the recoveries for their fees.   Therefore, the higher the value of the claim, the higher the potential fees for the PI Attorneys.

C.     **The Legitimate Diagnosis and Treatment of Neck and Back Pain**

17.     When a patient complains of neck and back pain following a motor vehicle accident, a licensed professional must obtain a detailed history and perform a legitimate examination to arrive at a proper diagnosis of the patient's condition. Based upon a legitimate diagnosis, a licensed professional must then engage in medical decision-making to design a legitimate treatment plan tailored to the unique needs of each patient.

18.     The decision of which, if any, types of treatment are appropriate for a patient, as well as the level, frequency, and duration of the various treatments should be individualized.  This individualized decision must consider the patient's unique circumstances, including his or her: (a) age; (b) social, family, and medical history; (c) physical condition, limitations, and abilities; (d) the location, nature, and severity of the injury and symptoms; and (e) response to any previous treatment.

19.     Treatment plans should generally start with conservative care that is not invasive, such as anti-inflammatory medications, chiropractic care, and/or physical therapy, which may benefit patients by healing their injuries and relieving their symptoms with minimal associated risks and costs.  If patients' symptoms are not relieved through conservative care, other forms of treatment may be appropriate to relieve their symptoms, including various kinds of injections and

other procedures designed to reduce pain and other symptoms caused by inflammation, irritation, or other conditions.  As with any other treatment option, whether to perform any kind of injection or other procedure should be tailored to the unique circumstances of each patient.

**D.      The Legitimate Use of Injections, Including ESIs, FIs, and MBBs.**

20.      A provider may perform injection procedures to allow for the therapeutic treatment of chronic pain in areas of the spine (lumbar, thoracic, and cervical), as well as joints (facet, shoulder, hip, wrist, etc.), and to diagnose the source of the back, neck, and limb pain.  Because injection procedures are invasive, involve the injection of steroids into the body, and may require the use of sedation, they present associated risks as well as increased costs to patients. Therefore, injections should be performed only when appropriate indications are present and a provider determines that they are medically necessary to diagnose and/or treat pain generators in and around the spine, to alleviate pain in order to facilitate conservative care, or to alleviate pain after conservative care has failed or is not an option.  Three common types of spine injection procedures are ESIs, FIs, and MBBs.

21.      Common clinical indications for ESIs are nerve-related pain radiating from the neck into the shoulders or arms or from the lower back into the buttocks or legs.  In these patients, a careful physical examination is required to evaluate for

associated sensory, motor, or reflex deficits in the involved limb(s) to help guide treatment and establish baseline status before initiating invasive treatment. Normally, these clinical findings and indications are correlated with radiologic evidence (*e.g.*, MRIs) of nerve-root irritation, inflammation, or compression at spinal levels that are consistent with the distribution of the patients' nerve-related pain and/or physical examination findings and that may be attributable to pathologies in and around the nerve roots.

22.     There are three basic kinds of ESIs – interlaminar, caudal, and transforaminal injections – that may be performed to relieve a patient's symptoms by introducing steroid medications into the epidural spaces surrounding the vertebral levels at which the suspected pain generating pathologies exist.   An interlaminar injection involves the insertion of the needle into the posterior epidural space between two adjacent vertebral lamina and delivering anesthetic and steroids, which then typically spread to epidural spaces above and below the injected space.  A caudal injection involves the insertion of the needle through the sacral hiatus (a small boney opening just above the tailbone) to deliver anesthetic and steroids that typically spread to epidural spaces above the injected space.  A transforaminal injection involves the insertion of the needle into the intervertebral neural foramen.  In a transforaminal injection, the provider injects the anesthetic and steroid into the area referred to as the "nerve sleeve," which allows the steroid

to travel up the sleeve and into a targeted epidural space.  While there is an increased level of technical expertise required to perform transforaminal injections, this type of injection allows for greater precision in targeting with medications the source of the patient's pathology, which results in a more concentrated delivery of the steroid into the affected area.  As discussed below, Dr. Radden virtually always performs interlaminar ESIs, not the caudal, or more targeted, skill-intensive approach of transforaminal ESIs.

23.    A patient who receives minimal or no relief from an initial ESI is less likely to benefit from a second round of ESIs.  Likewise, if a patient receives minimal or no relief from an initial and second round of ESIs, it is even less likely that the patient will benefit from additional rounds of ESIs.  Therefore, based upon the associated risks and costs, as a general matter ESIs should not be repeated without an interval assessment of the patient's response and unless the patient appears to get more than minimal relief from earlier ESIs.

24.    Facet joints are located on the back of the spine on each side where two vertebrae meet.  The facet joints provide stability and permit the spine to bend and twist.  Facet joints, which contain cartilage between bones, are surrounded by a sac-like capsule filled with a synovial fluid that reduces the friction between bony surfaces.  Inflammation, irritation, swelling, arthritis, or other pathologies in and around the facet joints may cause pain.  Medial branch nerves carry sensory

signals, including pain, from the facet joints and the muscles around those joints to the brain.

25.    The common indications for FIs and MBBs are chronic pain that is primarily concentrated in the back or neck.  The indications for FIs and MBBs are different from the indications for ESIs (*i.e.*, primarily radicular pain correlated with radiologic evidence of some form of nerve root pathology).

26.    FIs are performed by injecting anesthetics and steroids directly into the facet joints that are the suspected pain generators.  A patient who receives minimal or no relief from an initial FI is less likely to benefit from a second round of FIs.  Likewise, when a patient receives minimal or no relief from an initial and second round of FIs, it is even less likely that the patient will benefit from additional rounds of FIs.  Therefore, based upon the associated risks and costs, as a general matter FIs should not be repeated without an interval assessment of the patient's response and unless the patient appears to get more than minimal relief from earlier FIs.

27.    As an alternative to FIs, MBBs are commonly performed by injecting an anesthetic onto the medial branch nerves that carry sensory impulses, including pain, from a suspected pain-generating facet joint to the brain.  If the patient receives relief of back or neck pain from the MBB that lasts for the expected duration of the anesthetic, the provider will then typically prescribe a

radiofrequency neurotomy or similar procedure in which the medial branch nerves that carry pain signals from the pain-generating facet joint to the brain are thermally ablated to block the pain.  If a MBB does not provide relief, it suggests that the related facet joint or joints are not the pain generators.  Therefore, it is important to precisely assess the patient's response to determine the future course of treatment.

28.    To assist with the appropriate needle placement, ESIs, FIs, and MBBs are typically performed under fluoroscopic guidance.  Fluoroscopy is a radiological imaging technique used to obtain real-time images of the internal structures of a patient to help guide the path and proper placement of the needle during an injection.  When fluoroscopic guidance is used, a physician inserts a needle into the targeted area, a contrast is then injected, and a picture is taken, which the physician uses to confirm the needle is in the correct position.  Once it is confirmed that the needle is in the correct position, the injection can be performed.

29.    An epidurography is a separate diagnostic procedure involving the injection of contrast material into the epidural space when performing injections. Epidurography is not indicated or medically necessary to ensure appropriate needle placement because fluoroscopy is more than sufficient for this purpose.  Therefore, epidurography is typically indicated if there is a concern regarding conditions, pathologies, or structural abnormalities in and around the spine that might affect

the flow of steroids into the targeted space.  To bill for an epidurography under CPT Code 72275, the procedure must be medically necessary and include both a permanent image recording and a separate, detailed report summarizing the findings of the epidurogram examination.

30.     Because ESIs, FIs, and MBBs entail the insertion of needles into areas in and around the spine and ESIs and FIs often include the use of steroids, these injections involve potentially serious risks and substantially increased costs for the patient.  Therefore, ESIs, FIs, and MBBs should not be performed unless they are medically necessary, and if they are performed, attempts should be made to minimize the risks and costs.  The risks associated with these injection procedures include those associated with the patient's exposure to ionizing radiation and sedation, the side-effects and complications from steroids (*e.g.*, increased blood sugar, increased blood pressure, immunity reduction, adrenal suppression, psychosis, acute and chronic changes to the skin and bones such as fractures, avascular necrosis, and osteoporosis), and the direct procedure risks from the injection such as bleeding, infection, nerve injury, paralysis, and even death. Moreover, the costs associated with injection procedures can be substantial, as evident in Defendants' average charges, which for cervical and lumbar injections involving ESIs accompanied by two-level, bilateral FIs typically exceeded $14,500

per procedure.  (Exs. 2-3, Lumbar and Cervical Injection Procedures Charts, Total Billed columns.)

31.     As discussed next, Dr. Radden did not perform legitimate exams, did not make legitimate findings, and did not legitimately diagnose patients.  Instead, despite the associated risks and costs, the uniform patterns in Dr. Radden's purported findings, diagnoses, and injections were predetermined and designed to enrich Defendants by performing and billing substantial amounts to State Farm to exploit the unlimited No-Fault Benefits available to patients for services that were not indicated or medically necessary, and to curry favor with PI Attorneys by inflating the value of the BI and UM claims.

32.     Although the indications for ESI and FIs are different, Dr. Radden prescribed and performed these injections together on the same dates of service and without regard to the patients' responses to previous treatments (including the same injections from other providers), or whether conservative care had failed or was still an option.  Moreover, although ESI, FIs, and MBBs should not be repeated absent more than minimal pain relief, Dr. Radden nearly always repeats injections and yet fails to ever meaningfully examine and document patients' responses to previous injection procedures, or offer any credible medical basis that justifies the reasons for his decision to repeat an injection procedure.

**E.    The Fraudulent Examinations**

33.    The scheme begins with Dr. Radden's fraudulent examination of patients, including allegedly taking patients' history, performing physical exams, reaching diagnoses, and arriving at a treatment plan.  Specifically, Dr. Radden purports to examine the patients and then creates a report that supposedly details the patient's subjective complaints, and Dr. Radden's examination findings, diagnoses, and recommended treatment plan ("Exam Reports").  Dr. Radden uses the Exam Reports to justify the medically unnecessary ESIs, FIs, and MBBs.

34.    The Exam Reports do not reflect the patient's true subjective complaints, actual examination findings, a legitimate diagnosis, or a medically necessary treatment plan.  The Exam Reports are based on the boilerplate language contained in various templates prepared by Defendants ("the Templates").  The Exam Reports reflect uniform patterns that are predetermined and not credible. (Exhibits 4-6, Sample Exam Report Templates (emphasis added within); Exhibits 7-9, Sample Exam Reports (emphasis added within).)

35.    As set forth in the chart attached hereto as Exhibit 1A, when Dr. Radden purports to perform a lumbar examination, the Exam Reports reflect that nearly every patient allegedly reports that: (a) his or her low back pain is "radiat[ing]"; (b) his or her pain "is better with lying down, worse with sitting and standing"; (c) she or he complains of "leg weakness, tiredness and a positive

shopping cart sign"; and (d) she or he "denies any saddle anesthesia, urinary incontinence or retention."  (Ex. 1A; *see also* Ex. 7 at 1; Ex. 8 at 1; Ex. 9 at 1.)

36.    As set forth in the chart attached hereto as Exhibit 1B, when the initial examination involves a lumbar examination, Dr. Radden's findings are the same for nearly all patients: (a) the patient is alert and oriented times three; (b) his or her leg lengths are equal; (c) his or her hips and gait are normal; (d) "[t]here are no signs of decompression, kyphosis scoliosis[,] or pelvic tilt"; (e) the patient has positive posterior midline tenderness, positive paramedian tenderness to the left and right in the lower lumbar spine; (f) he or she "is able to lateral bend to the left and right"; (g) the patient has a normal neurologic exam of "5/5 in the bilateral lower extremities with hip flexors, quadriceps, tibialis anterior, EHL[,] and gastroc/psoas complex"; (h) "[t]here are no sensory deficit in the L1 to S1 distributions"; (i) the patient's "[d]eep tendon reflexes are +2/4 for quadriceps and Achilles, no clonus"; and (j) he or she has vascular scores of "+2/4 for the dorsalis pedis and post tibialis."  (Ex. 1B, *see also* Ex. 7 at 3; Ex. 8 at 3; Ex. 9 at 2-3.)

37.    As set forth in the chart attached hereto as Exhibit 1A, when Dr. Radden purports to perform a cervical examination, the Exam Reports reflect that nearly every patient allegedly reports that: (a) his or her neck pain is "radiat[ing]"; (b) his or her pain is "better with the arm at the side, worse with overhead

activity"; and (c) she or he "denies any trouble with fine motor movements."  (Ex. 1A; *see also* Ex. 7 at 2; Ex. 8 at 2; Ex. 9 at 1-2.)

38.     As set forth in the chart attached hereto as Exhibit 1B, when the initial examination involves a cervical examination, Dr. Radden's findings are the same for nearly all patients: (a) the patient is alert and oriented times three; (b) his or her leg lengths are equal; (c) his or her hips and gait are normal; (d) he or she has positive posterior midline tenderness and positive paramedian tenderness to the left and right in the lower cervical spine; (e) the patient has a normal neurologic exam of "5/5 in the bilateral upper extremities with deltoid, biceps, triceps, wrist flexors, wrist extensors, finger flexors, finger extensors[,] and intrinsics"; (f) there are no sensory deficits in the C5 to T6 distributions; (g) the patient's deep tendon reflexes are +2/4 for biceps, triceps, brachioradialis; and (h) the patient's vascular exam is normal with radial and ulnar pulses.  (Ex. 1B; *see also* Ex. 7 at 3-4; Ex. 8 at 3-4; Ex. 9 at 2-4.)

39.     These predetermined complaints and findings are used to support Dr. Radden's predetermined diagnosis of strains/sprains, facet syndrome, and disc herniations (*see* Exs. 1A and 1B), in addition to other diagnoses that may be made for some patients, to support his recommendation for and performance of cervical and lumbar injections.  Dr. Radden's initial diagnoses are non-specific, and even if he receives additional information concerning patients' conditions (*e.g.*, imaging

studies), Dr. Radden never attempts to correlate his initial diagnosis to that additional information or arrive at a more specific diagnosis.

40.     Dr. Radden also routinely finds that patients are "disabled from replacement services," without ever documenting the basis or specific rationale for his findings.  These disability determinations allow Dr. Radden to curry favor with PI attorneys by increasing the value of the patients' claims.

41.     Given the uniform patterns appearing among all of the Exam Reports, the Exam Reports do not reflect legitimate descriptions of patients' pain or the results of a legitimate examination, but instead reflect predetermined findings that Dr. Radden uses to justify his decision to subject patients to medically unnecessary ESIs, FIs, and MBBs.  The prevalence and uniformity of the patient complaints, findings, and diagnoses are simply not credible.

42.     Furthermore, despite the increased risks and costs to patients, Dr. Radden uses his predetermined pattern of patient complaints, findings, and diagnoses to support his recommendation and performance of injections, often without regard to the patient's medical history, including whether the injections might be medically necessary to facilitate conservative care, to alleviate pain after conservative care has failed or is not an option, or based upon the timing, type, and the patient's response (or lack thereof) to prior injections.

43.     As discussed next, the Exam Reports do not reflect the legitimate examinations of patients, but are part of Defendants' predetermined protocol. Defendants designed the Exam Reports to support injection procedures that are not medically necessary and are prescribed without regard to the substantially undue risks and costs to the patients.

**F.     The Fraudulent Treatment Recommendations**

44.     Based upon Dr. Radden's predetermined reports of patient complaints, findings, and diagnoses, Dr. Radden subjects patients to a uniform protocol of injections that is predetermined, is not tailored to the unique needs of any patient, does not evaluate or respond to any changes in the patients' conditions, and subjects patients to substantial undue risks and costs.

45.     Specifically, as reflected in the charts attached hereto as Exhibits 2-3, Dr. Radden begins his uniform predetermined injection protocol by initially recommending and then performing a series of three lumbar and/or cervical injections typically spaced only two weeks apart.  Even if any of the initial injection recommendations were truly indicated for any patient based upon a legitimate exam and diagnosis, which they were not in the case of Dr. Radden, peer-reviewed medical literature and professional medical society guidelines clearly establish there was no legitimate basis for Dr. Radden to uniformly recommend and perform a series of three injections.

46.     According to guidelines published by the North American Spine Society, the American Academy of Physical Medicine and Rehabilitation, the American Academy of Pain Medicine, the Anesthesia Patient Safety Foundation, the American Society of Interventional Pain Physicians, and the International Spine Intervention Society, a routine series of three injections, like those recommended and performed by Dr. Radden, is never indicated.  In fact, State Farm is not aware of any professional medical society guidelines that support a routine series of three injections.  Instead, patients should be examined and assessed after each injection, to determine if another injection is warranted.

47.     Until approximately the spring or summer of 2013, Dr. Radden followed one uniform predetermined protocol for cervical and lumbar injections. Specifically, as reflected on the chart attached hereto as Exhibit 2, for lumbar injections, on each visit Dr. Radden performed interlaminar ESIs at either the L4-5 or L5-S1 levels of the spine, along with bilateral FIs at two levels.  According to his reports for these lumbar injection procedures, Dr. Radden injected 80 mg. of Depo-Medrol, along with 2 cc of saline and 1 cc of .25% Marcaine with epinephrine into the targeted epidural space – either L4-5 or L5-S1 – plus 80 mg. of Depo-Medrol and 1 cc of .25% Marcaine with epinephrine into the targeted bilateral facet joints at each of two levels.  As a result, Dr. Radden's protocol, which was not performed because it was medically necessary in the first place,

involved the injection of at least 160 mg. of the steroid Depo-Medrol into each patient during each lumbar injection procedure.

48.     Similarly, until approximately the spring or summer of 2013, as reflected on the chart attached hereto as Exhibit 3, for cervical injections, on each visit Dr. Radden performed interlaminar ESIs at either the C6-7 or C7-T1 levels of the spine, along with bilateral FIs (and, on most occasions, MBBs) at two levels. According to his reports for these cervical injection procedures, Dr. Radden injected 80 mg. of Depo-Medrol, along with 1 cc of saline into the targeted epidural space – either C6-7 or C7-T1 – plus 80 mg. of Depo-Medrol and 1 cc of .25% Marcaine with epinephrine into the targeted bilateral facet joints and/or related medial branch nerves at each of two levels.  This means that Dr. Radden's protocol, which was not performed because it was medically necessary in the first place, involved the injection of at least 160 mg. of the steroid Depo-Medrol into each patient during each cervical injection procedure.

49.     Because the indications for ESIs are different from the indications for FIs and MBBs, it is rarely indicated that they should be performed on the same date of service for any patient.  Yet, until approximately the spring or summer of 2013, Dr. Radden's predetermined protocol was to perform ESIs and FIs together on nearly all lumbar injection visits, and ESIs, along with both FIs (and, on most occasions, MBBs) together on nearly all cervical injection visits.  (Exs. 2-3.)

50.     Furthermore, FIs are indicated to treat neck or back pain stemming from facet joints.  MBBs are typically indicated to determine if a specific facet joint is a pain generator by having patients record their responses for several hours after the block, while the anesthetic is actively blocking the nerves.  Because MBBs and FIs are done for different reasons, it is rarely indicated that FIs and MBBs should be performed together.  Yet, until approximately the spring or summer of 2013, Dr. Radden's predetermined protocol was to perform MBBs and FIs together on nearly all cervical injection visits where patients received cervical ESIs.  (*See generally* Ex. 3, Cervical Injection Procedures Chart.)

51.     In addition, if an MBB provides relief and indicates that a particular facet joint is a pain generator, standard practice is to perform radiofrequency neurotomy or similar procedure to thermally ablate the medial branch nerves that carry sensory impulses, including pain, from the suspect facet joint to the brain. This is done because it is known to provide much longer relief of a patient's pain and does not carry risks of repeated injections of steroids.  Yet, until approximately the spring or summer of 2013, Dr. Radden never performed a radiofrequency neurotomy or similar procedure on any of the patients at issue in Exhibits 2 and 3.

52.     As set forth in the charts attached hereto as Exhibits 2 and 3, in approximately the spring or summer of 2013, Dr. Radden changed his uniform predetermined protocol for injections to start typically with two or more rounds of

ESIs before proceeding to FIs and, at times, MBBs.   (Exs. 2-3, Lumbar and Cervical Injection Procedures Charts.)

53.     As discussed above, before a provider repeats an ESI, there should be documentation that the patient received more than minimal pain relief from the preceding injection procedure.   However, Dr. Radden's predetermined injection protocols, before and after the spring or summer of 2013, involved multiple rounds of injections (with each injection typically repeated every two weeks) for nearly all patients with no meaningful attempt to determine the patient's response or lack thereof to any of the injections.   Indeed, Dr. Radden fails to ever meaningfully examine and document patients' responses to injection procedures, or offer any credible medical basis that justifies the reasons for his decision to repeat an injection procedure.

54.     For example, Dr. Radden performed a series of six rounds of injections on a 24-year-old male patient injured in an motor vehicle accident.   In particular, Dr. Radden performed three lumbar ESIs accompanied by multiple-level, bilateral FIs, and three cervical ESIs accompanied by multiple-level, bilateral FIs and MBBs.   The patient testified that he had told Dr. Radden that he had already received three lumbar injections from another provider, which failed to provide him with any pain relief whatsoever.  (Exhibit 10, 4/16/2013 Tr., at 24-26.) Nonetheless, Dr. Radden recommended additional ESIs at L4-5 along with FIs at

L4-S1, which he performed on January 30, February 13, and February 27, 2013 without conducting any interval examinations between the injections. (Exhibit 11, 1/14/2013 Exam Report, at 2; 1/30/13, 2/13/13, & 2/27/13 Procedure Notes.) The patient testified that Dr. Radden never explained the risks of the procedures, but simply told the patient that he needed the injections to "stop pain." (Ex. 10, 4/16/2013 Tr., at 29.) The patient received no pain relief from any of the lumbar injections performed by Dr. Radden and saw only a "little improvement" in his range of motion after receiving the third round of cervical ESIs and FIs (which were also accompanied by MBBs at the same levels). (*Id.* at 29-32.) In short, there was no appropriate basis upon which to perform the first injection procedure, or any of the other procedures that followed.

55.    Likewise, on September 6, 2011, Dr. Radden performed a series of lumbar ESIs at L4-L5, with multiple-level, bilateral FIs at L4-L5 and L5-S1, on a 22-year-old male patient. (Ex. 12, 9/6/11, 9/21/11, and 10/12/11 Procedure Notes, at 3-4, 7-8, 11.) Three days before the injection procedure, the patient's low back pain was documented as an 8 out of 10 in treatment notes from a chiropractor. (*Id.,* 9/3/11 Associated Note, at 1.)

56.    The chiropractor examined the patient again during an office visit two days after the first injection procedure – on September 8, 2011 – and documented that the patient's low back pain was now 9 out of 10. In other words, the patient's

low-back pain had become worse, not better, after the injection procedure.  (*Id.*, 9/8/11 Associated Note, at 5.)   Nevertheless, without documenting the patient's response to the first injection, Dr. Radden performed a second round of ESI and FIs at the same lumbar levels approximately two weeks later on September 21, 2011.  (*Id.*, 9/21/11 Procedure Note, at 7-8.)   The very next day, a chiropractor examined the patient, noted that the patient had "sharp pain generalized in the lower back," and reported the pain level in the lower back was 8 out of 10.  (*Id.*, 9/22/11 Associated Note, at 9.)    Again, however, without documenting the patient's response to the second injection, Dr. Radden proceeded with a third round of ESI and FIs at the same lumbar levels on October 12, 2011. (*Id.*, 10/12/11 Procedure Note, at 11.)   After the third round of injections, on October 15, 2011, the chiropractor again examined the patient, reported that the patient was still experiencing lumbar pain, and noted "his lumbar region pain is feeling unchanged from the last visit. . . ." and had "low back pain at 8. . . ." (*Id.*, 10/15/11 Associated Note, at 12.)   Finally, after subjecting the patient to three rounds of injections, Dr. Radden purportedly examined the patient on October 31, 2011, and stated that the injections "helped his back and leg complaints minimally," as the patient "still complains of back. . . pain."  (*Id.*, 10/31/2011 Exam Report, at 14.)   In short, although the patient never received any significant pain relief from the first round of lumbar injections, let alone the two rounds that followed, Dr. Radden subjected

the patient to three rounds of injections, despite having failed to conduct and document any interval assessment of the patient's response to the procedures to determine whether a subsequent injection would provide more than minimal relief.

57.     Dr. Radden examined the patient again on January 16, 2012, and again found that the patient "continu[ed] to complain of low back pain and lower extremity radicular symptoms" with [l]umbar spine range of motion [] decreased to 75 percent of normal." (*Id.*, 1/16/12 Exam Report, at 16-17.)  Although the first round of lumbar injections failed to provide the patient with any pain relief, Dr. Radden nonetheless scheduled the patient for another series of lumbar ESIs at L4-5 with multiple-level, bilateral FIs at L4-5 and L5-S1 on January 31, 2012, February 29, 2012, and March 14, 2012.  (*Id.*, 1/31/12, 2/29/12, and 3/14/12 Procedure Notes, at 19, 22, 25.)   Again, Dr. Radden performed these injections without examining and documenting the patient's response to the first or second injection procedure.   Once again, however, medical records prepared by a chiropractor reflect that the patient's lumbar back pain remained 8 out of 10 after each injection procedure.   (*See id.,* 2/2/12 Associated Note, at 20 ("lower back condition has not changed" and "low back pain at 8"); *id.*, 3/6/12 Associated Note, at 23 ("lumbar region pain is feeling unchanged from last visit" and "low back pain at 8"); *id.* 3/15/12 Associated Note, at 26 (same).)  Incredibly, on May 23, 2012, despite the fact that the patient did not experience any pain relief from the six rounds of ESI at

L4-5 and six bilateral FIs at levels L4-5 and L5-S1, Dr. Radden once again recommended that the patient undergo another round of ESIs at L4-5 with bilateral FIs at L4-S1.  (*Id.*, 5/23/12 Exam Report, at 28-30.)

## G.    Dr. Radden's Inappropriate Use of Epidurograms for All ESIs

58.    Epidurography is a separate diagnostic procedure involving the injection of contrast into the epidural space, and must include both a permanent image recording and a separate, detailed report summarizing the findings of the examination under CPT Code 72275.  Epidurography is not indicated or medically necessary to ensure appropriate needle placement or epidural delivery of contrast because fluoroscopic guidance is more than sufficient for this purpose.  Therefore, epidurography is generally indicated if there is a concern regarding conditions, pathologies, or structural abnormalities in and around the spine that may be missed by the preceding MRI or CT scans or may affect the flow of steroids into the targeted space.

59.    As part of Dr. Radden's predetermined injection protocol, he purports to perform and bill for an epidurography nearly every time he performs an ESI. (Exs. 2-3, Lumbar and Cervical Injection Procedures Charts, "Epidurogram" Column.)  Dr. Radden performs the epidurograms pursuant to his predetermined injection protocol, not because they are medically necessary for the patients. Indeed, Dr. Radden: (a) does not document any indication for the epidurograms;

(b) purportedly performs them with only 1 cc of Isovue – an amount that would likely not be sufficient for a legitimate epidurogram; (c) repeats the epidurograms on nearly every ESI visit without documenting any indication for repeating it; (d) does not keep any images of the alleged epidurograms; (e) does not create a separate, detailed report of his findings; and (f) improperly unbundles the billing codes and charges that Spine Specialists submitted to State Farm at the direction of Dr. Radden by billing separate charges for the fluoroscopy and epidurograms, which, at best, should be bundled into a single charge.

## H.    Dr. Radden's Inappropriate Use of Sedation During Injection Procedures

60.    For patient safety, minimal levels of sedation should be used when performing injections and verbal communication should be maintained with the patient.  In fact, in many instances physicians can safely perform ESIs, FIs, and MBBs without the use of any sedation.  A patient who is not heavily sedated may function as a secondary monitor during the injection procedure and may be able to prevent potentially catastrophic injury arising from a misplaced needle, among other things, by complaining about pain or parethesias.  While sedatives may be appropriate for some patients to help lessen their anxiety, minimum levels of sedation should be used based on the unique needs and circumstances of each patient.  The routine use of sedation on patients is therefore not the standard of care.

61. Dr. Radden, however, almost always performs injections procedures on patients who are sedated by a certified registered nurse anesthetist ("CRNA") working under Dr. Radden's direction. In fact, Dr. Radden has testified it is part of his predetermined protocol to sedate patients before performing injection procedures, regardless of whether it is medically necessary to do so. (Ex. 13, 8/17/2011 Deposition of L. Radden, at 15.) Dr. Radden has testified that he automatically provides monitored sedation for all injection procedures "[u]nless the patient requests that they don't want anesthesia." (Ex. 14, 5/8/12 Deposition of L. Radden, at 28.)

62. From June 2011 and continuing until November 2012, Ambulatory Anesthesia Associates, PC billed for nearly all of the sedation services provided by its CRNAs during the injection procedures performed at Defendants' Bingham Farms office. However, in late 2012, several CRNAs previously associated with Ambulatory Anesthesia Associates, PC became associated with a different sedation provider – namely, American Anesthesia Associates, LLC. Since early 2013 to present, American Anesthesia Associates, LLC has provided and billed for the majority of sedation services provided at the Bingham Farms office.

63. While it is uncertain at this time the nature of the relationship between Dr. Radden, American Anesthesia Associates, LLC, Ambulatory Anesthesia Associates, PC, and the CRNAs who worked for or were affiliated with these

entities, Dr. Radden's decision to sedate all patients, regardless of their unique circumstances, facilitated charges from these entities for services that were performed pursuant to Dr. Radden's predetermined protocol, not because such services were medically necessary to address the needs of any particular patient. This exposed patients to increased risks of sedation, and increased risks of procedures performed under sedation.

## I.      The Fraudulent Procedure Notes

64.    Much like his Exam Reports, Dr. Radden's documentation of injection procedures ("Procedure Notes") are boilerplate and not credible.   In particular, Dr. Radden prepares two types of Procedure Notes for patients receiving lumbar and cervical injections.  These Procedure Notes, which were submitted to State Farm, supposedly document the injections performed on each patient on each visit.  Neither the Exam Reports described above nor the Procedure Notes provides a specific anatomic diagnosis to justify the location of the ESIs, FIs, or MBBs.

65.    Until approximately the spring or summer of 2013, Dr. Radden used nearly identical Procedure Notes for all patients upon whom he performed lumbar injections.  (Ex. 15, Sample Lumbar Injection Procedure Notes.)  In fact, while there were several areas where the specific lumbar levels were handwritten, the Procedure Notes did not vary materially from one patient to the next.  (*See generally id.*)  In the Procedure Notes, Dr. Radden diagnoses nearly all patients

receiving lumbar injections with the same preoperative and postoperative diagnoses of lumbar disc herniation, facet syndrome, and lumbar spondylosis. (Ex. 2, Lumbar Injection Procedures Chart.)  Thus, neither his Exam Reports, nor his Procedure Notes provide a specific anatomic diagnosis to justify the procedures he performs.

66.    The Procedure Notes also contained boilerplate language about the "Operative Procedure," which for nearly all lumbar patients reflected the predetermined protocol of an ESI, epidurogram, fluoroscopy, and bilateral FIs at two levels.  (Ex. 15, Sample Lumbar Injection Procedure Notes.)  Moreover, until approximately the spring or summer of 2013, for patients receiving lumbar injections, the *Operative Procedure in Detail* section in the Procedure Notes repeated for all patients the following language:

OPERATIVE PROCEDURE IN DETAIL:  The patient was placed in the prone position.  The back was prepped and draped under usual surgical technique.  Under fluoroscopic control, the appropriate disc space was identified.  The area was infiltrated with 1% Xylocaine.  Once again under fluoroscopic control, the Touphy needle was then easily inserted into the epidural space.  This was confirmed by the loss-of-resistance technique.  After this, approximately 1 cc of Isovue was then injected into the epidural space.  The dye flowed freely along the nerve roots without obstruction.  Following this, 80 mg. of Depo-Medrol and 2 cc of saline and 1 cc of 0.25% Marcaine with epinephrine were injected into the epidural space.  Once this was complete, the Touphy needle was then easily inserted into the bilateral facet joints at __L4-5__ Once this was complete, 80 mg. of Depo-Medrol and 1 cc of 0.25% Marcaine with epinephrine were injected into the bilateral facet joints at ___C4-5___. The previous sequence of events was repeated with the bilateral facet joint injections at ___L5-S1___

—The patient tolerated the procedure well and remained neurologically stable.

(*Id.*)  With the exception of the specific lumbar levels, which were almost always either L4-5 or L5-S1, all Procedures Notes for lumbar ESI patients were the same.

- 32 -

67.    Similarly, until approximately the spring or summer of 2013, Dr. Radden used nearly identical Procedure Notes for all patients upon whom he performed cervical injections.  (Ex. 16, Sample Cervical Procedure Notes.)  In fact, while there were several areas where the specific cervical levels were handwritten, the Procedure Notes did not vary materially from one patient to the next.  (*Id.*)  In the Procedure Notes, Dr. Radden diagnoses nearly all patients receiving cervical injections with the same preoperative and postoperative diagnoses of cervical disc herniation, cervical stenosis, cervical facet syndrome, and cervical spondylosis. (Ex. 3, Cervical Injection Procedures Chart.)  Thus, neither his Exam Reports, nor his Procedure Notes provide a specific anatomic diagnosis to justify the procedures he performs.

68.    The Procedure Notes also contained boilerplate language about the "Operative Procedure," which for nearly all cervical patients reflected the predetermined protocol of an ESI, epidurogram, fluoroscopy, and bilateral FIs and MBBs at two levels.   (Ex. 16, Sample Cervical Injection Procedure Notes.) Moreover, until approximately the spring or summer of 2013, for patients receiving cervical injections, the *Operative Procedure in Detail* section in the Procedures Notes repeated for all patients the following language:

OPERATIVE PROCEDURE IN DETAIL: The patient was placed in the prone position. The patient's neck was prepped and draped under usual sterile technique. Under fluoroscopic control, the appropriate disc space was identified. The appropriate interlaminar window was identified. The skin was anesthetized with 1% Xylocaine. Once again under fluoroscopic control, the Touphy needle was then easily advanced through the interlaminar window utilizing the loss of resistance technique. After this, approximately 1 cc of Isovue was then injected into the epidural space. The dye flowed freely along the nerve roots without obstruction. After this approximately 1 cc of 80mg of Depo-medrol and 1 cc of normal saline were injected into the interlaminar window. Once this was complete, the Touphy needle was then easily inserted into the facet joint bilaterally at ___C6-7___ and then bilaterally at ___C7 T1___. Once this was completed, 80mg of Depo-Medrol and 1 cc of 0.25% Marcaine with epinephrine were injected into the facet joint medial branch at ___C6-7___ and then bilaterally at ___C7 T1___

The patient tolerated the procedure well and remained neurologically stable. The patient was awake and transferred to recovery without any complications.

(*Id.*)  With the exception of the cervical levels, which were almost always either C6-7 or C7-T1, all Procedures Notes for cervical ESI patients were the same.

69.     As noted above, in approximately the spring or summer of 2013, Dr. Radden changed his uniform predetermined protocol for both cervical and lumbar injections to start typically with two or more rounds of ESIs before proceeding to FIs and, at times, MBBs.  Thus, the Procedure Notes reflecting the change in Dr. Radden's uniform predetermined protocol for both cervical and lumbar injections do not show ESIs being performed on the same dates of service as FIs and MBBs. However, with the exception of the lumbar and cervical levels, the Procedure Notes otherwise do not vary materially from one patient to the next, nor does Dr. Radden ever meaningfully examine and document patients' responses to earlier injection procedures, or offer any credible medical basis that justifies the reasons for his decision to repeat an injection procedure.

**J.      All of The Above Procedures Were Done To Support Fraudulent Charges.**

70.     The purported services described above were designed and carried out to enrich Defendants by maximizing their collection of patients' No-Fault Benefits.

71.     After a lumbar injection procedure, Dr. Radden, through his company, Spine Specialists, typically submitted charges of $2,000 for the lumbar ESI, $9,000 for two-level, bilateral FIs ($4,500 for each bilateral FI), $1,400 for the epidurogram, $300 for the fluoroscopy, $375 for the surgical tray, $600 for the contrast, and $880 for the steroid.  Thus, the total charges for a lumbar injection procedure typically exceeded $14,500. (*See* Ex. 2, Lumbar Injection Procedures Chart, Total Billed column.)

72.     Similarly, after a cervical injection procedure, Dr. Radden, through his company, Spine Specialists, typically submitted charges of $2,000 for the cervical ESI, $9,000 for two-level, bilateral FIs and MBBs ($4,500 for each bilateral FI accompanied by an MBB at the same levels), $1,400 for the epidurogram, $300 for the fluoroscopy, $375 for the surgical tray, $600 for the contrast, and $880 for the steroid.  Thus, the total charges for a cervical injection procedure typically exceeded $14,500. (*See* Ex. 3, Cervical Injection Procedures Chart, Total Billed column.)

73.     Dr. Radden also caused to be submitted the fraudulent charges for the fees associated with the anesthesia services, as these services were performed at his

direction pursuant to his predetermined protocol, not because such services were medically necessary. The charge for the anesthesia used during the injection procedures typically was approximately $400 for each date of service. (*See* Exs. 2-3.)

74. As discussed above, Defendants' scheme began in 2007, but increased exponentially once Dr. Radden purchased his own office location in June 2011. In particular, between 2007 to June 2011, Dr. Radden, through his company, Spine Specialists, billed State Farm for only 51 dates of service involving injection procedures. However, since June 2011, Dr. Radden performed more than 530 dates of service involving injection procedures, almost all of which took place at his Bingham Farms office.

75. Moreover, as noted above, when Dr. Radden performs ESIs, he nearly always directs Spine Specialists to submit charges for epidurography and fluoroscopy, along with the various charges associated with all of the injections. Setting aside that Dr. Radden's documentation does not justify his decision to subject any patient to an epidurogram (or an ESI for that matter), there should not have been a separate bill for fluoroscopy (which was billed under CPT code 77003) when he performed an epidurogram. CPT code 72275, the code for epidurography, includes fluoroscopic guidance as part of the description of the procedure. Thus, the submission of charges for both an epidurogram and

fluoroscopy improperly unbundled the billing codes in order to inflate the total charges for Dr. Radden's services.

76.     Moreover, in the few instances in which Dr. Radden performed only an FI on a patient, there should not have been a separate bill for fluoroscopic guidance under CPT code 77003.  CPT code 77003 is not separately reportable because the CPT code for FIs includes the use of image guidance in the code description.

77.     In addition, the bills submitted by Spine Specialists at the direction of Dr. Radden used a false billing code to justify an inflated $600 charge associated with Dr. Radden's purported use of a contrast.  Specifically, Dr. Radden's own documentation for ESI procedures states that he used the contrast Isovue.  (Exs. 15-16, Sample Lumbar and Cervical Injection Procedure Notes.)  The appropriate billing code for Isovue is Q9947.  On several occasions in 2007 and once in 2010, Dr. Radden charged $15 for his purported use of Isovue under Q9947.  However, shortly after Dr. Radden moved into his own suite in the summer of 2011, the bills submitted to State Farm for his services reflected a substantially higher charge of $600 for his purported use of a "gadolinium-based magnetic resonance contrast agent" under the code A9579.  None of Dr. Radden's documentation suggests the use of a gadolinium-based magnetic resonance contrast agent or otherwise supports the use of the much higher charge submitted under A9579.

**K.     State Farm's Reasonable Reliance**

78.     Defendants are obligated legally and ethically to act honestly and with integrity.   Yet, Dr. Radden caused Spine Specialists to submit bills and documentation that are fraudulent in that they represent that services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to a predetermined protocol and not because they were medically necessary.   The bills and documentation were designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits.

79.     State Farm is under statutory and contractual duties to promptly pay No-Fault Benefits for medically necessary services.   The bills and supporting documentation submitted to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to cause, and did cause, State Farm to rely on them.

80.     As a result, State Farm has incurred damages of more than $400,000 in benefits paid based upon the fraudulent charges.

**V.     CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
**COMMON LAW FRAUD**
**(Against All Defendants)**

81.     State Farm incorporates, adopts, and re-alleges as though fully set forth herein, each allegation in Paragraphs 1 through 80 above.

82.     Defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, at Dr. Radden's direction, thousands of bills and related documentation that are fraudulent and contained false representations of material fact. The bills and related documentation submitted to State Farm at Dr. Radden's direction were fraudulent in that they represented that: (a) Dr. Radden performed legitimate examinations of patients, when in fact he did not; (b) Dr. Radden provided medically necessary pain-management injections, anesthesia services, and related procedures to patients, which were individually tailored to each patient's unique needs, when in fact the pain-management injections, anesthesia services, and related procedures either were not performed or were performed pursuant to a predetermined protocol, designed to enrich Defendants by maximizing collection of the patients' No-Fault Benefits and not because they were medically necessary; (c) Dr. Radden's use of epidurography in conjunction with all the ESIs that he performed was medically necessary, when in fact the epidurography either was not performed or was performed pursuant to a predetermined protocol, not because it was medically necessary for the patients; (d) charges submitted under billing code A9579 were appropriate because Dr. Radden had used a gadolinium-based magnetic resonance contrast agent during injection procedures, when in fact none of his documentation suggests the use of a gadolinium-based magnetic resonance

contrast agent or otherwise supports Defendants' charges under A9579; (e) the separate charges for epidurograms and fluoroscopy were appropriate when in fact the code for epidurography includes fluoroscopic guidance as part of the description of the epidurography procedure and the submission of charges for both an epidurogram and fluoroscopy improperly unbundled the billing codes; (f) when Dr. Radden performed only an FI on a patient, it was appropriate to bill separately for fluoroscopic guidance under CPT code 77003 when in fact CPT code 77003 was not separately reportable because the CPT code for FIs includes the use of image guidance in the code description; and (g) Dr. Radden's disability findings were supported by a documented basis and rationale, when in fact these findings were rendered pursuant to a predetermined protocol and are not supported by a documented basis and rationale. The bills, documentation, and the corresponding mailings are described in part in Exhibits 1A-1B and 2-3, attached hereto. Representative samples of these bills and supporting documentation are attached as Exhibits 4-9, 11-12, and 15-16.

83. Defendants knew that the above-described misrepresentations made to State Farm relating to the purported examinations, pain-management injections, anesthesia services, and related procedures were false and fraudulent when they were made.

84.     Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm into relying on the misrepresentations.

85.     Because of its reliance on these misrepresentations, State Farm has incurred damages of more than $400,000.

86.     The willful, reckless, and/or wanton conduct of Defendants entitles State Farm to exemplary damages.

WHEREFORE, State Farm demands judgment against Defendants for compensatory damages, exemplary damages, costs, and other such relief as this Court deems equitable, just, and proper.

## SECOND CLAIM FOR RELIEF
### VIOLATION OF 18 U.S.C. §1962(c)
### (Against Defendant Louis N. Radden, M.D.)

87.     State Farm incorporates, adopts, and re-alleges as though fully set forth herein, each allegation in Paragraphs 1 through 86 above.

88.     Spine Specialists is a corporation and an "enterprise" (the "Office Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

89.     Defendant Dr. Radden is and has been employed by and/or associated with the Office Enterprise.

90.     Since at least February 2007 and continuing uninterrupted to the present, Dr. Radden has knowingly conducted and/or participated, directly or

indirectly, in the conduct of the Office Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of United States mails to submit to State Farm thousands of bills and documentation that are fraudulent for examinations, pain-management injections, anesthesia services, and related procedures which either were not performed or were not medically necessary and individually tailored to the unique needs of each patient.  Specifically, the bills and related documentation Dr. Radden caused to be submitted to State Farm were fraudulent in that they represented that: (a) Dr. Radden performed legitimate examinations of patients, when in fact he did not; (b) Dr. Radden provided medically necessary pain-management injections, anesthesia services, and related procedures, to patients, which were individually tailored to each patient's unique needs, when in fact the pain-management injections, anesthesia services, and related procedures either were not performed or were performed pursuant to a predetermined protocol, designed to enrich Dr. Radden by maximizing collection of the patients' No-Fault Benefits and not because they were medically necessary; (c) Dr. Radden's use of epidurography in conjunction with all the ESIs that he performed was medically necessary, when in fact the epidurography either was not performed or was performed pursuant to a predetermined protocol, not because it was medically necessary for the patients; (d) charges submitted under billing code

A9579 were appropriate because Dr. Radden had used a gadolinium-based magnetic resonance contrast agent during injection procedures, when in fact none of his documentation suggests the use of a gadolinium-based magnetic resonance contrast agent or otherwise supports charges under A9579; (e) the separate charges for epidurograms and fluoroscopy were appropriate when in fact the code for epidurography includes fluoroscopic guidance as part of the description of the epidurography procedure and submission of charges for both an epidurogram and fluoroscopy improperly unbundled the billing codes; (f) when Dr. Radden performed only an FI on a patient, it was appropriate to bill separately for fluoroscopic guidance under CPT code 77003 when in fact CPT code 77003 was not separately reportable because the CPT code for FIs includes the use of image guidance in the code description; and (g) Dr. Radden's disability findings were supported by a documented basis and rationale, when in fact these findings were rendered pursuant to a predetermined protocol and are not supported by a documented basis and rationale.

91.     The bills and the corresponding mailings, which comprise the pattern of racketeering activity identified through the date of this Complaint, are described in part in Exhibits 1A- 1B and 2-3, attached hereto.  Representative samples of these bills and supporting documentation are attached as Exhibits 4-9, 11-12, and 15-16.

92.     State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $400,000 based upon the fraudulent charges associated with examinations, pain-management injections, anesthesia services, and related procedures.

WHEREFORE, State Farm demands judgment against Defendant Dr. Radden for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against the All Defendants)

93.     State Farm incorporates, adopts, and re-alleges as though fully set forth herein, each allegation in Paragraphs 1 through 92 above.

94.     State Farm conferred a benefit upon Defendants by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments.

95.     Because Defendants knowingly submitted charges for examinations, pain-management injections, and related procedures that were either not rendered or not medically necessary and individually tailored to the unique needs of each patient, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

96.     As a direct and proximate result of the above-described conduct, State Farm has been damaged and Defendants have been unjustly enriched by more than $400,000.

WHEREFORE, State Farm demands judgment against Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

### FOURTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT
### (Against Defendant Spine Specialists of Michigan, P.C.)

97.     State Farm incorporates, adopts, and re-alleges as though fully set forth herein, each allegation in Paragraphs 1 through 96 above.

98.     This is an action for declaratory relief pursuant to 28 U.S.C. §2201.

99.     There is an actual case and controversy between State Farm, on the one hand, and Defendant Spine Specialists, on the other hand, as to all charges for examinations, pain-management injections, and related procedures that have not been paid.  State Farm contends that Defendant Spine Specialists is not entitled to reimbursement for any of these charges, which exceed $75,000.

100.   Because Defendants made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm, Defendant Spine Specialists is not entitled to

reimbursement for any unpaid charges associated with the examinations, pain-management injections, and related procedures of patients.

WHEREFORE, State Farm respectfully requests a judgment declaring that Defendant Spine Specialists is not entitled to reimbursement for any of the unpaid charges for the examinations, pain-management injections, and related procedures, and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a trial by jury.

Dated this 25th day of August, 2014.

MILLER, CANFIELD, PADDOCK & STONE P.L.C.

By:  s/ Matthew P. Allen
       Thomas W. Cranmer (P25252)
       Matthew P. Allen (P57914)
       Miller, Canfield, Paddock & Stone P.L.C.
       840 W. Long Lake Road, Suite 200
       Troy, Michigan  48098
       (248)-267-3381
       cranmer@millercanfield.com
       allen@millercanfield.com

       Ross O. Silverman (IL 6226560)
       John W. Reale (IL 6282236)
       Katten Muchin Rosenman LLP

525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5200
ross.silverman@kattenlaw.com
john.reale@kattenlaw.com


*Attorneys for Plaintiff State Farm Mutual Insurance Company*